IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ABRAHAM BARAJAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13 C 837 |
| | ) | |
| VILLAGE OF CARPENTERSVILLE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Abraham Barajas ("Barajas") brought this civil rights action under 42 U.S.C. § 1983 ("Section 1983") against the Village of Carpentersville (the "Village"), its Officer Jeffrey W. Elliott ("Elliott") and three other police officers who have since been dismissed from the case. Barajas' Section 1983 claim asserts that Elliott arrested him without probable cause and conspired with others to do so, and it is coupled with related counts under Illinois law for false imprisonment, malicious prosecution and intentional infliction of emotional distress. Lastly, Barajas brings a claim for indemnification against the Village under 735 ILCS 10/9-102. Now before this Court for decision is the Fed. R. Civ. P. ("Rule") 56 motion for summary judgment on all counts brought by the Village and Elliott.

## Summary Judgment Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to the nonmovant (here Barajas) and draw all reasonable inferences in his favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471

(7th Cir.2002)).[1]  Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir.2003)).  But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists, and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir.2008)).  Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

## Background[2]

Because of the analytical problem described in n.1, this Background section begins with Barajas' description of the events that have culminated in the institution of this litigation.  It then turns to defendants' version on which they predicate their current Rule 56 motion.

---

[1] What has just been said in the text must be tempered where, as here, a defendant officer's motion for summary judgment poses the issue of probable cause for an arrest and ensuing detention.  In that context the information that has come to the officer from other sources may satisfy the probable cause requirement even though Barajas' current version of events differs from that provided by the other sources on which the officer relied at the time of arrest and thereafter.  What inferences were reasonable for the officer to draw from the totality of the evidence available to him is a question distinct from what inferences this Court can reasonably draw from the entire record, and only the latter must be drawn in Barajas' favor.

[2] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon.  This opinion identifies Barajas' submissions as "B." and those of Elliott and the Village as "E.," followed by appropriate designations: LR 56.1 statements as "St. ¶ --," responsive statements as "Resp. St. ¶ --" and memoranda as "Mem. --."  For the sake of clarity this opinion will refer to E. St. Ex. D as "Barajas Dep.," E. St. Ex. E as "Elliott Dep.," E. St. Ex. F as "Drews Dep.," E. St. Ex. G. as "Murphy Dep.," E. St. Ex. H as "Gonzalez Dep.," E. St. Ex. I as "Accomando Dep." and B. St. Ex. 7 (a Village Crime Report prepared by Elliott) as "Crime Rep."

First, Barajas' version.  Sometime around 11 p.m. on July 11, 2011 he went for a bike ride near his parents' house in the Village (Barajas Dep. 50, 72-73).  When he saw some relatives of his ex-wife "grouping," as he put it, in front of their uncle's house down the street (Barajas Dep. 68-70, 73; see also B. St. ¶ 60), he was concerned because relations with his ex-wife were tense (B. St. ¶ 61; Barajas Dep. 70-71) -- indeed, she had obtained an order of protection against him (B. St. ¶ 61; Barajas Dep. 43-44), although Barajas cannot remember why she said she needed one (Barajas Dep. 78-79).  But Barajas continued riding instead of returning home (id. at 71).

As he passed the group on his bike, some of them shouted threats at him (Barajas Dep. 73).  Then three of his ex-wife's relatives got into their parents' Volkswagen and ran him off the road as they passed (id. at 74-75, 80).

As he sat in a neighbor's yard attempting to reattach his bicycle chain, he heard shots from a couple of blocks away (Barajas Dep. 75, 83), and a bystander informed him that the shooting occurred on Birch Street, a street on which some of Barajas' friends lived (id. at 76-77). Concerned for their safety -- his ex-wife's relatives were members of the Surrenos street gang, while his friends were members of the rival Latin Kings -- Barajas rode his bike to his friends' house and found one of his friends and his mother outside with flashlights checking the exterior for bullet holes (B. St. ¶ 62-63; Barajas Dep. 34-35, 77).  They did not tell Barajas anything about who might have fired the shots (Barajas Dep. 35).

**Birch Street Investigation Before Barajas' Arrest**

This opinion now turns to defendants' account.  Officer Joseph Murphy ("Murphy") arrived at Barajas' friends' house in response to several reports of shots fired, with a number of other officers pulling up soon after (B. Resp. St. ¶ 44; Murphy Dep. 24-25).  There was broken

glass in the middle of the street in front of the house (B. Resp. St. ¶ 20; Elliott Dep. 25; Murphy Dep. 24; Crime Rep. 2), and Barajas and a resident of the house[3] were standing outside (Murphy Dep. 24; Crime Rep. 2).

Barajas told police he was not near the house when the shooting occurred (Barajas Dep. 36; Elliott Dep. 24), and his friend told Murphy that a silver car and a tan car had just left the area heading north (Murphy Dep. 25). Murphy relayed that information over the radio, noting that the shooter might be in one of those cars (B. St. ¶ 64; Murphy Dep. 25-26).

But then Sergeant Giacomo Accomando ("Accomando") radioed from the Village police station to tell Murphy that they needed to question Barajas and that Murphy should take him into custody (B. Resp. St. ¶ 57; Murphy Dep. 27, 30-31; Accomando Dep. 36-37). According to Barajas several officers then charged him, shouting at him to put his hands behind his head (B. Resp. St. ¶ 2; Barajas Dep. 35).

And here the record is in dispute. What comes next reports Barajas' version first, then followed by the stories of the officers.

Barajas testified at his deposition that the officer who arrested him, whom he believes to have been Elliott, pulled up in his squad car -- Barajas is certain he was not one of the officers already at the scene -- grabbed him, slammed him up against the car with his arm pinned behind his back, held him there for a good minute while screaming obscenities at him, handcuffed him (too tightly) and then tossed him inside the vehicle rather than allowing him to get in (Barajas Dep. 104-6, 109; see also B. St. ¶ 82). Barajas said that the officer who arrested him and

---

[3] Accounts differ as to which of two brothers was outside and spoke with police (see Barajas Dep. 89; Elliott Dep. 21, 128-29; Murphy Dep. 24), but that difference is immaterial because Barajas does not deny that the conversation actually occurred.

- 4 -

transported him to the station also read him his Miranda rights at the station and had badge number 199 (Barajas Dep. 54-56). Later he identified that officer as Elliott (id. at 63-64), whose badge number is indeed 199 and who is listed as the arresting officer on the arrest report (Elliott Dep. 49-50, 53; B. St. Ex. 6 at 2; Crime Rep. 4). And Barajas was already well-acquainted with Murphy as a result of the latter's gang unit patrol duties (Barajas Dep. 58; Murphy Dep. 18-23).

Elliott and Murphy aver, however, that Murphy was the arresting officer and brought Barajas to the police station (uneventfully) (Elliott Dep. 18, 40; Murphy Dep. 27, 29-32, 39-40). According to them and Accomando, Elliott was already at the scene (having arrived soon after Murphy) and stayed at Barajas' friends' house after Barajas was arrested to collect more evidence (Elliott Dep. 19, 21, 28; Murphy Dep. 25, 40; Accomando Dep. 32, 36). Elliott was assertedly listed as the arresting officer only because he was the one who called an Assistant State's Attorney for permission to charge Barajas with a crime and who was assigned for follow-up investigation (Elliott Dep. 35, 49-50). And in his LR 56.1 statement Barajas himself backs away from his deposition testimony, saying that Murphy initially took him into custody and conceding that Elliott was the "arresting officer" because he was assigned to the case and so completed the arrest report (B. Resp. St. ¶ 13).

In sum, although what has been recounted in the preceding paragraph might well -- indeed might more probably -- lead a factfinding jury to reject Barajas' inculpation of Elliott as described in the paragraph before that, the Rule 56 requirement of crediting the nonmovant's evidence, together with reasonable inferences drawn from that evidence, calls for this opinion to give credence to Barajas' version. And another consequence of that outcome could also reasonably give rise to the jury's discrediting of Elliott's testimony about his own conduct. But as will be seen, that set of possibilities does not necessarily spell doom to the Rule 56 motion.

**Pre-Arrest Investigation at the Police Station**

While police were interviewing witnesses on Birch Street, Accomando and Officer Carlos Gonzalez ("Gonzalez") were meeting with Barajas' ex-wife's relatives at the Village police station (B. St. ¶ 65; B. Resp. St. ¶ 22). Those witnesses had driven to the station in two cars after having stopped briefly at Austin Park to check (they claimed) if anyone had been injured (see B. St. Ex. 1-5).

Accomando testified at his deposition that he interviewed the drivers of the two vehicles, one of whom was the only woman in the group, trusting that Gonzalez was questioning the others (Accomando Dep. 28-29). Accomando compared what he heard with Gonzalez's summary of his interviews and also with information received over the radio from Elliott and Murphy (id. at 32). Neither Accomando nor Gonzalez noted any inconsistencies in the stories at the time (id. at 33).

According to those stories the witnesses (Accomando does not say how many) were in their Volkswagen in front of a Wal-Mart in East Dundee when another vehicle pulled up (Accomando Dep. 26, 33, 38). After an exchange of words, that vehicle's occupants got out and started hitting the Volkswagen with baseball bats, prompting the witnesses to flee toward Elgin, trailed by their assailants (id. at 26, 33). While stopped at a traffic light in Elgin, they were attacked again with baseball bats after their attackers had hurled some gang-related slurs at them (id. at 33, 38). They called their brother, who told them to head for Centerville (id. at 26, 33).

After spending some time at a house there, they left in two cars, the Volkswagen and a gray Chrysler,[4] for a 7-Eleven (id. at 27, 33-34).

It was at that point that the witnesses saw Barajas on his bicycle -- he was known by the female witness because he was married to (and was divorcing) her cousin (id. at 34). She said that Barajas had become hostile toward her family since the divorce began (id. at 36). As the two cars drove by, Barajas yelled at the occupants and fired at the first car, the one driven by the woman (id. at 35). As she sped away she saw in her rear-view mirror the muzzle flash from Barajas firing at the second vehicle (id. at 35). All five witnesses were visibly upset and provided similar statements (id. at 37).

At the station the witnesses showed Accomando the damage to the cars, identifying the dents from the baseballs bats on the Volkswagen and a bullet hole in the Chrysler's rear door on the passenger side (id. at 26-27). They also pointed to a broken window on the Chrysler's rear passenger side, saying they assumed it had been shot out (id. at 27).

Accomando also had reports from the crime scene that Barajas was there and was on a bicycle (id. at 41). Those reports further noted that there was glass on the roadway where the shooting occurred (id. at 41).

At his deposition Gonzalez recalled speaking with a man and a woman (B. Resp. St. ¶ 48; Gonzalez Dep. at 20-22). He did not remember the conversation in detail or whether she identified the shooter, but he could recall that she said they had been shot at and that Barajas

---

[4] Accomando says that the second vehicle was gray without specifying its make (Accomando Dep. 27). Elliott's Crime Report identifies it as a gold Chrysler and relates that Barajas identified it in the same way at the crime scene (Crime Rep. 2). This Court will assume that it could also be fairly described as tan, the color that Murphy ascribed to the second vehicle, and the car for which police should have been searching (see Murphy Dep. 25-26).

involved (B. Resp. St. ¶ 49; Gonzalez Dep. 23-25). "[T]hey were all saying that it was Abraham Barajas" (Gonzalez Dep. 27-28). All the witnesses said the same thing, so Gonzalez treated their statements as reliable (id. at 45). Only later did Gonzalez learn that some of the witnesses were gang members (id. at 45-46).

**Later Investigation**

Once Barajas had been arrested Elliott continued his investigation of the shooting (Elliott Dep. 19, 28; see also B. Resp. St. ¶ 23). Barajas' friend said that he had been asleep at the time, so he did not know what Barajas had been up to (Crime Rep. 2). He was more familiar with what his brother -- who was still sleeping and did not want to speak with police -- had done before the shooting (id.). According to Barajas' friend, his brother had "got into it" with some members of the Surrenos gang earlier that night (id.), and he suspected that the shooting might have been in retaliation for that (id.). Moreover, after the shooting he and Barajas had gotten into his car and driven around looking for the shooter before returning home (id.).

Barajas' friend also directed Elliott to three bullet holes in the side of his house, one of which was new, he said (B. Resp. St. ¶¶ 17-18, Elliott Dep. 23; Crime Rep. 2). Elliott also found two bullet holes in an unoccupied house on the opposite side of the street, but he was unable to obtain entry to search for fragments (Elliott Dep. 28; Crime Rep. 2).

On his return to the police station, Elliott was told in summary form what the cars' occupants had said to Accomando and Gonzalez (Elliott Dep. 26-27; Crime Rep. 3). In addition to what this opinion has already recounted, that summary emphasized that the alleged victims were themselves members of the Surrenos, that their attackers in East Dundee and Elgin were part of the rival Latin Kings and that one of those attackers lived at the house where the shooting occurred (Crime Rep. 3).

- 8 -

Elliott then spoke with the alleged victims (Elliott Dep. 26-28, 43). At his deposition he said that he asked all five whether Barajas was the shooter and they answered as a group that he was, but Elliott was unable to remember whether he asked for and received confirmation from each witness individually (id. at 31-32, 77).

At some point that night the alleged victims also reiterated their stories in written statements (B. St. Ex. 1-5). Because Barajas rests his opposition to the current motion almost entirely on the assertion that "[t]hose statements are rife with inconsistencies" (B. Mem. 3), this opinion now describes some of the differences among them.

Only two of the written reports identify Barajas by name (see B. St. Ex. 1 and 5), although Accomando later identified some scratched-out portions of a third statement as bearing Barajas' initials (Accomando Dep. 60).[5] And even though those two witnesses agree on what Barajas shouted as he fired, as does a third witness (B. St. Exs. 1, 3 and 5), that agreement is assertably suspect because those witnesses were in different cars (and thus at a different distance from Barajas), in addition to which one of the two cars had its windows rolled up (Crime Rep. 3).

Just two written statements mentioned the earlier incidents with the baseball bats (B. St. Exs. 1 and 2). One witness said they were heading home before they got side-tracked and started toward 7-Eleven (B. St. Ex. 5), two said they headed straight for 7-Eleven (B. St. Exs. 2 and 4) and two said nothing about 7-Eleven at all (B. St. Exs. 1 and 3). One says the shooting occurred as "[w]e passed by Birch" (B. St. Ex. 1); another, after they "turned on Birch" (B. St. Ex. 2); a third one reads, "turn at Birch then I when [sic] back towards Robin" (B. St. Ex. 3); a fourth, "at

---

[5] That statement had rejected three possible descriptions of the shooter by scratching them out before settling on "the Guy" (B. St. Ex. 3).

Birch Street" (B. St. Ex. 5); and one says nothing about the location at all (B. St. Ex. 4). One witness wrote that four shots were fired (B. St. Ex. 5), another wrote that the car took two bullets (B. St. Ex. 2), and the other three said nothing about the number of shots fired. Only three of the witnesses said they stopped and checked for injuries before heading to the police station (B. St. Exs. 1, 2 and 3). One of the witnesses uses vulgarity when saying that Barajas almost killed his little brother (B. St. Ex. 5).

Gonzalez recovered a bullet fragment from the second vehicle's left rear door panel (B. Resp. St. ¶ 52; Gonzalez Dep. 33-36). Another officer performed a gunshot residue test on Barajas (B. Resp. St. ¶¶ 5, 36; Barajas Dep. 85-86; Drews Dep. 25; B. St. Ex. 8 at 2).

Several officers, including Elliott, interviewed Barajas at the police station (Barajas Dep. 40; Elliott Dep. 38-39; Crime Rep. 3). Barajas told them what he knew about the shooting, including that he had seen his ex-wife's relatives "grouping" before the shooting and that they tried to run him off the road (Barajas Dep. 37-38, 68-69; Crime Rep. 3). Elliott remembers Barajas as identifying the vehicles' occupants as Surrenos gang members (Elliott Dep. 42, 63-64; Crime Rep. 3) and as saying he was afraid they were going to retaliate against his friends on Birch Street (Crime Rep. 3).

Elliott says he then checked a police database that listed Barajas as someone who admitted to membership in the Latin Kings (Crime Rep. 4). But Barajas claims he was never affiliated with a gang and never told any of the officers that he was a Latin King (Barajas Dep. 58-59, 68). And to rebut that charge he attaches to his LR 56.1 statement the Officer Safety Alert Card that the Village maintains on him (B. Resp. St. ¶ 29; see also B. Resp. St. ¶ 43). That document indicates that (1) he has adopted the Latin Kings' style of dress, associates with them and has adopted their hand signs, symbols or tattoos, (2) he has been arrested more than once

- 10 -

with gang members for offenses consistent with known gang activity and (3) he has been stopped with known gang members four or more times -- but it has no check mark in the box for "Admits to Gang Membership" (B. St. Ex. 11).

After police told Barajas that three of the five witnesses had identified him as the shooter and threatened him with prosecution, he began to suffer an asthma attack, but he did not have a rescue inhaler with him (B. St. ¶ 73; Barajas Dep. 42, 53, 65-66, 86-87; Crime Rep. 4). Either Elliott or another officer kicked him about seven times while he was curled up on the floor (B. St. ¶¶ 73, 84; Barajas Dep. 103-04, 106). Paramedics came (B. St. ¶ 85; Barajas Dep. 66-67), but Barajas was forced to crawl to the ambulance rather than being carried out on a stretcher, and another police office kicked him again in the presence of the paramedics (Barajas Dep.108-09).

After Barajas was brought back to the station from the hospital, he had a video-conferenced hearing with a judge (Barajas Dep. 67, 80-81). Barajas was charged with five counts of attempted murder in the first degree, two counts of aggravated discharge of a firearm at a vehicle, aggravated discharge of a firearm without a Firearm Owner's Identification Card, aggravated discharge of a firearm while under an active Order of Protection and criminal damage to property (B. St. Ex. 6).

In the police synopsis of the charges Elliott wrote (falsely and maliciously, Barajas alleges) that all five occupants of the vehicles had identified Barajas as the shooter (B. St. Ex. 6 at 2). Elliott also claimed that Barajas had admitted to membership in the Latin Kings during the interview (id.).

Barajas' gunshot residue test was mishandled for reasons that do not appear on the record (see B. St. ¶ 71). It was left to sit in the evidence locker and was not sent to the State Crime Lab for another 11 months (id.), when it came back negative (id. at ¶ 72; B. St. Ex. 9). All charges

against Barajas were dismissed (Barajas Dep. 82). He believes that everything was a set-up by his ex-wife (Barajas Dep. 46).

## **Probable Cause for Barajas' Arrest?**

As <u>Mustafa v. City of Chicago</u>, 442 F.3d 544, 547 (7th Cir. 2006) teaches:

> Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution.

Moreover, even if probable cause is lacking "[a]n officer is entitled to qualified immunity if a reasonable officer could have mistakenly believed that probable cause existed" (<u>Burritt v. Ditlefsen</u>, 807 F.3d 239, 250 (7th Cir. 2015) (internal quotation marks omitted)).

In that respect <u>Mucha v. Vill. of Oak Brook</u>, 650 F.3d 1053, 1056-57 (7th Cir. 2011) (internal quotation marks and citations omitted) explains:

> Probable cause exists if at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. Probable cause requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true. In evaluating probable cause, we look only to the information known to the officer at the time of arrest, and we view the circumstances of the arrest from the perspective of a reasonable person in the position of the officer. Thus, the jury should determine the existence of probable cause only if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.

Ordinarily eyewitness testimony suffices for probable cause even when contradicted by the suspect, although further investigation may be necessary if the officer knows that the accuser harbors a grudge (for example, accusations by evicted tenants against their landlord) or if it is doubtful that the allegations even constitute a crime (<u>Askew v. City of Chicago</u>, 440 F.3d 894, 895 (7th Cir. 2006)).

As to the source of the information upon which officers may rely, <u>United States v. Valencia</u>, 913 F.2d 378, 383 (7th Cir. 1990) has said:

> The police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency. In that case, the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause.

In that last respect, where the evidence available to investigators in the aggregate suffices for probable cause, knowledge of that evidence may be mutually imputed to the entire group even absent testimony that the information was actually shared so long as they were working together closely (<u>United States v. Parra</u>, 402 F.3d 752, 765-66 (7th Cir. 2005), quoting <u>United States v. Nafzger</u>, 974 F.2d 906, 911 (7th Cir. 1992)).

Barajas seeks to place great weight on the fact that only two witnesses identified him as the shooter and that those witnesses had reason to be biased against him. Certainly a jury would have to decide whether to credit Accomando's and Gonzalez's statements that all of the witnesses identified Barajas orally before writing out the documents upon which Barajas' assertion relies. Those officers also knew that there were some soured familial relationships involved, although in this case any reason for bias against Barajas also counts as a motive on his part, and Barajas' suggestion that one witness' use of vulgarity in accusing him of trying to kill his little brother should have alerted the officers to potential bias is unsound. But Murphy did say over the radio that Barajas and his friend had identified a silver or tan car as the shooter, a description that matched the cars that arrived at the station, so Accomando and Gonzalez should have known that their witnesses had been accused of being the source of the shots that drew police to the scene.

But Barajas was not ordered to be arrested (whether by Elliott, as Barajas would have it, or by Murphy, as the defense would have it) on the basis of the witnesses' testimony alone. For

it was undeniable that the Chrysler had been shot. One of its windows had been broken. There was broken glass in the middle of the road where the shooting occurred. It was certainly reasonable to believe that the Chrysler had been shot on Birch Street in front of Barajas' friends' house. Barajas was at that location with his bicycle when police arrived minutes later. And thus Accomando was justified in crediting the witnesses who said that Barajas shot at them on Birch Street while riding his bicycle -- even if that identification came only from the two witnesses whom Accomando interviewed personally, because Barajas does not state or imply that the other three fingered somebody else.

As stated earlier, there is a dispute over whether Elliott or Murphy was the one to arrest Barajas, but even when Barajas' testimony that it was Elliott is credited, he cannot prevail on a claim for false arrest. Even under that scenario Elliott acted on Accomando's order, and Accomando had probable cause to believe that Barajas had shot at the vehicles, striking one of them.

### **Probable Cause for Barajas' Continued Detention and Prosecution?**

Most of Barajas' arguments that Elliott lacked probable cause rely on evidence available to him only after the arrest. That does not on its own scuttle Barajas' case, though, for probable cause at the moment of arrest is not enough to insulate an arresting officer from liability. On the contrary, BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) made this clear three decades ago:

> The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause.

But once a judicial determination of probable cause takes place, as happened here, the blame (and hence the potential liability) for an innocent suspect's continued detention rests with the

prosecutor and not the police (assuming of course that the latter do not withhold exculpatory evidence) (cf. Garcia v. City of Chicago, 24 F.3d 966, 971 (7th Cir. 1994)).

That shift of legal responsibility need not be invoked to torpedo this aspect of Barajas' case, however, because the additional evidence that Elliott uncovered did not serve to dissipate the initial probable cause for his arrest in any event. Barajas points to such minor inconsistencies in the witnesses' written statements as whether the shooting occurred "at" Birch Street or "on" Birch.[6] Other supposed inconsistencies involve facts appearing in one statement but not another, such as whether the witnesses were heading to 7-Eleven or whether they stopped at Austin Park to check if anyone was injured before heading to the police station. Barajas insists that the cars were going the wrong way if they wanted to go to Elgin, because 7-Eleven is in the opposite direction.

Barajas notes those aspects of the written statements in an effort to make it plausible that all five of the witnesses had made up the entire story. As Barajas would have it, once it was learned that the witnesses were members of a rival gang the arresting officer would be required to conclude that they went by Barajas' friends' house looking to retaliate for the earlier incidents in East Dundee and Elgin, tried to run Barajas down on his bike, fired shots at his friends' house, met up at Austin Park to get their stories straight and then proceeded to the police station in order to frame him.

But even if that strained scenario were to be credited, it would still not explain how a bullet ended up in the Chrysler's door panel or how a house on the opposite side of the street

---

[6] Barajas' assertion that one witness "does not even mention Birch, instead claiming the shooting occurred as they were heading back towards Robin" (B. Mem. 4) flatly misrepresents the record, which reads "turn at Birch then I [went] back towards Robin" (B. St. Ex. 3). Birch intersects Robin (B. St. Ex. 10).

from his friends' house ended up with two bullet holes. For even if the arresting officer should have realized that the witnesses were concealing something -- or even that they were the aggressors in all of this -- it was still reasonable for him to believe that at a minimum Barajas fired back.

In short, more than one reason calls for the rejection of Barajas' last effort to frame a viable Section 1983 claim. This opinion, then, turns to his efforts to draw upon state law theories of liability to invoke the supplemental jurisdiction confirmed by 28 U.S.C. § 1367(a).

## Malicious Prosecution Claim

Barajas attempts to ground his state-law malicious prosecution count on the additional contention that Elliott lied to the Assistant State's Attorney about how many of the witnesses identified Barajas as the shooter and his gang membership in seeking approval for the felony charges. But under Illinois law, too, "probable cause is an <u>absolute</u> defense to malicious prosecution" (<u>Porter v. City of Chicago</u>, 393 Ill. App. 3d 855, 866, 912 N.E.2d 1262, 1271 (1st Dist. 2009) (emphasis added)). And so Barajas cannot get before a jury to argue that Elliott's synopsis was inaccurate, let alone that any such inaccuracy must have resulted from malice.

## Intentional Infliction of Emotional Distress

During his deposition Barajas testified that he was beaten at several points during his arrest and interrogation at the police station, and he now shoehorns those accusations into a count grounded in a state-law theory of intentional infliction of emotional distress. But importantly he did not advance those allegations in his Complaint, which tied his emotional distress solely to his having been arrested and prosecuted (falsely and maliciously, he claims). Nor did he think to mention, when answering questions at his deposition about what happened during his arrest or asthma attack, that he was slammed into a squad car or kicked repeatedly while gasping for air

(Barajas Dep. 35-36, 52-53, 65-67, 86-87). When asked about physical injuries, he mentioned only that his handcuffs had been too tight (id. at 97-100). Not until he was pressed on the severity of his mental anguish did he bring up that purported abuse (id. at 101-03).

That just won't fly. Although as stated earlier Rule 56 motions are not conceived as the occasion for making determinations as to credibility, is difficult to see how Barajas and his counsel can assert -- in the subjective and objective good faith demanded by Rule 11(b) -- that he was subjected to the violence described in the preceding paragraph but simply forgot about it even while remembering that his handcuffs were too tight. But because Barajas' only potentially surviving contention -- one asserting the intentional infliction of emotional distress -- is advanced under the supplemental jurisdiction provision of 28 U.S.C. § 1367(a) without any federal claim remaining to underpin it, this Court sees no reason to retain it under the circumstances.

Accordingly that potentially surviving contention is dismissed without prejudice. Barajas and his counsel are reminded, however, to consider the possibility that if they were inclined to reassert that contention in a state court of competent jurisdiction, they might well run into a defense of claim preclusion for advancing a position that should have been but was not presented in this case as part of the same Article III case or controversy.[7]

## Attorneys' Fees

Elliott and the Village have sought to round out their summary judgment motion with a request for an award of "reasonable attorneys' fees incurred in connection with preparing their motion, memorandum and [Local] Rule 56.1(a) statement of facts" (E. Mem. 22). No basis is

---

[7] What has just been said in the text should not be mistaken as a ruling or advisory opinion on the part of this Court -- it is intended only to provide food for thought.

stated for such a request -- if perhaps they are asserting a claimed violation of Rule 11(b), they themselves have flouted every procedural requirement of Rule 11(c)(2), including the need for such a motion to identify the conduct to be sanctioned. Barajas and his counsel have paid that attorneys' fees demand the attention that they apparently believed it deserved -- which is to say, none. This opinion will do the same, adding only a reminder to the movants that "the filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions" (Note of Judicial Conference's Advisory Committee on Civil Rules as to the 1993 amendment to Rule 11(b) and (c)).

## Conclusion

Because there was probable cause to arrest Barajas and such probable cause was not dissipated by Elliott's later investigation, Barajas cannot now prevail on his federal claims for false arrest or conspiracy to arrest him falsely. Barajas' state law counts for false imprisonment and malicious prosecution fall for the same reason, and without the establishment of any tort claim the Village is under no state law indemnity obligation. Accordingly Elliott's and the Village's motion for summary judgment (Dkt. No. 44) is granted as to all counts except the one asserting intentional infliction of emotional distress, which is dismissed without prejudice, and their joint request for attorney's fees is denied. All of that amounts to the final termination of this action.

_____
Milton I. Shadur
Senior United States District Judge

Date: April 29, 2016